## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| S.J-D., *et al.*, <br><br>                    *Plaintiffs*, <br><br>        v. <br><br> DISTRICT OF COLUMBIA, <br><br>                 *Defendant*. | No. 24-cv-00707 (DLF) |

### <u>MEMORANDUM OPINION</u>

R.J., S.D., and their child, S.J-D., bring this action against the District of Columbia under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, challenging the District of Columbia Public Schools' (DCPS) failure to provide S.J-D. a free appropriate public education (FAPE). *See* Compl., Dkt. 3-2. Before the Court is the plaintiffs' Motion for Summary Judgment, Dkt. 9, and the District's Cross-Motion for Summary Judgment, Dkt. 11. For the following reasons, the Court will deny the plaintiffs' motion and grant the District's motion.

## I.    BACKGROUND

### A.    Statutory Framework

Under the IDEA, "every child with a disability in this country is entitled to a 'free appropriate public education,' or FAPE." *Leggett v. District of Columbia*, 793 F.3d 59, 62 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1400(d)(1)(A)). For students with disabilities, public school officials must "develop a comprehensive strategy, known as an 'individualized education program,' or IEP, tailored to the student's unique needs." *Id.* at 63 (quoting 20 U.S.C. § 1414(d)(1)(A)). "To meet its substantive obligation under the IDEA, a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017).

Among other requirements, an IEP must include "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child" along with "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class." 20 U.S.C. § 1414(d)(1)(A)(i)(IV)–(V). Special education services "in general education" are provided in the regular classroom and among non-disabled peers, whereas special education services "outside general education" are provided apart from the general student population in a specialized classroom. *See Z.B. v. District of Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018).

Under the IDEA, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). "[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* In other words, students must "be educated in the least restrictive environment possible," *Leggett*, 793 F.3d at 74, such that "they receive education in the regular classroom whenever possible," *Endrew F.*, 580 U.S. at 400 (citation modified). Under DCPS policy, a student's IEP will provide for "full-time" specialized instruction only when she requires "20 or more hours of specialized instruction per week outside the general education classroom." D.C. Pub. Sch. Off. of Specialized Instruction, Programs & Resources Guide for Staff 4 (2014), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/GAGA-2015-R0046-AttachmentJ9OSI14-15ProgramsandResourcesGuideforStaff.pdf.

The IDEA also requires local education agencies to "establish and maintain procedures in accordance with [the IDEA] to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]." 20 U.S.C. § 1415(a). For example, the IDEA provides parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child." *Id.* § 1415(b)(1). As relevant here, schools must give "timely access" to parents or their designee "for observing a child's current or proposed special educational program" upon request. D.C. Code § 38-2571.03(5)(A); *see* 20 U.S.C. § 1401(9) ("The term [FAPE] means special education and related services that . . . meet the standards of the State educational agency."). School districts must also review and revise a student's IEP "not less frequently than annually." 20 U.S.C. § 1414(d)(4)(A)(i)–(ii).

Parents with either substantive or procedural complaints about a school's "'identification, evaluation, or educational placement' of their child or to its 'provision of a [FAPE]' may request a due-process hearing." *Davis v. District of Columbia*, 244 F. Supp. 3d 27, 32 (D.D.C. 2017) (quoting 20 U.S.C. § 1415(b)(6)). At this hearing, parents are entitled to have counsel accompany and advise them, to present evidence, to cross-examine witnesses, and to receive a written decision from the hearing officer. 20 U.S.C. § 1415(h). Parents may then bring a civil action in state or federal court for judicial review of the hearing officer's decision. *Id.* § 1415(i)(2)(A).

### B. Factual Background

S.J-D. is a thirteen-year-old student. *See* Compl. ¶ 4. She attended Francis Stevens Elementary School (Francis Stevens), a D.C. public school, from 2015 to 2021—from pre-kindergarten through the fourth grade. *See id.* ¶ 10. In September 2018, when S.J-D. was in the second grade, Francis Stevens developed a plan under Section 504 of the Rehabilitation Act to

address her ADHD.  Administrative Record (AR) 42, Dkt. 7.  In February 2020, when S.J-D. was in the third grade, DCPS found her eligible for special education and related services as a student with an Other Health Impairment for ADHD, and it developed an initial IEP for S.J-D.  AR 91–92, 102.  One month later, in March 2020, Francis Stevens transitioned to virtual learning because of the COVID-19 pandemic.  *See* AR 116, 122.

S.J-D.'s initial IEP included goals in math, reading, and written expression.  AR 104–08.  To achieve those goals, DCPS prescribed specialized instruction of (1) two hours per week in reading and one hour per week in math, in general education, and (2) one hour per week in written expression and two hours per week in math, outside general education in a "small setting."  AR 109–10.  By the end of the 2019–20 school year, S.J-D.'s progress reports reflected that, out of five math goals, she mastered one, progressed on two, and was "not introduced" or "just introduced" to two due to the pandemic.  AR 118–20.  Out of her four reading and writing goals, she progressed on two and was not introduced to two.  AR 120–22.

S.J-D. advanced to the fourth grade and continued to attend Francis Stevens during the 2020–21 school year.  Compl. ¶ 14.  The school continued to instruct its students in a virtual learning environment that year due to the pandemic, and a portion of S.J-D.'s IEP suggested that she was "working predominantly in groups one on one with a teacher or with one other student."  AR 137.  Her final IEP progress report reflected that she progressed on all reading and writing goals and that, out of four math goals, she progressed on two and made no progress on two that had been introduced in the prior quarter. AR 150–54.

In February 2021, DCPS convened an IEP team meeting.  AR 133.  The IEP team maintained S.J-D.'s disability classification for ADHD, updated her IEP's goals, and maintained the same number of specialized instruction hours.  AR 133, 135–40.

At the end of S.J-D.'s fourth-grade year, her parents removed her from Francis Stevens and placed her in the Lab School of Washington, a private special-education school. Compl. ¶ 15; AR 29. The record contains "no correspondence from [the parents] explaining their decision," but the parents later expressed their concern about staffing shortages at Francis Stevens. AR 29. S.J-D. enrolled in the fifth grade at the Lab School for the 2021–22 school year. AR 192.

In January 2022, S.J-D.'s parents consulted a private psychologist, Dr. Susan Hammond, who confirmed S.J-D.'s ADHD diagnosis. AR 155, 157. Under the Diagnostic and Statistical Manual of Mental-Disorders-Fifth Edition (DSM-V) criteria, Dr. Hammond also diagnosed S.J-D. with a language disorder, a generalized anxiety disorder, and specific learning disorders with impairment in reading and math. AR 157–58. In her report, Dr. Hammond "fully support[ed] [S.J-D.'s] parents' decision to place her at the Lab School," and asserted that S.J-D. required "small groupings in all academic subjects, as well as individualized instruction in reading and math," and "speech/language therapy." AR 167. That report was shared with the IEP team on May 10, 2022. AR 1073. Two months later, S.J-D.'s parents informed DCPS that S.J-D. would continue to attend the Lab School for the 2022–23 school year and requested funding. AR 206. DCPS denied their request to fund S.J-D.'s private-school placement. AR 255.

In August 2022, DCPS convened an IEP meeting and provided a draft IEP. AR 208, 211. In the August 2022 IEP, DCPS updated S.J-D.'s goals and provided specialized instruction of (1) two hours per week in reading, one hour per week in math, and one hour per week in written expression, all in general education, and (2) two hours per week in math outside general education. AR 213–25. The IEP also added other classroom aids and services like time for breaks, repetition of directions, and frequent check-ins. AR 224–25.

In addition, DCPS independently reviewed Dr. Hammond's evaluation and administered its own educational assessments of S.J-D. AR 228–45. DCPS determined that S.J-D. did not meet the criteria for a specific learning disability classification, as advocated by Dr. Hammond, and maintained her Other Health Impairment classification for ADHD. AR 241–42. DCPS also concluded that the Lab School records did not show that S.J-D. had a disabling oral communication disorder that would make her eligible for speech-language pathology services. AR 249. The parents were unsatisfied with the proposed August 2022 IEP because, in their view, it provided too few specialized instruction hours outside general education. *See* AR 252.

In September 2022, DCPS further assessed S.J-D. under a comprehensive speech and language evaluation. AR 268–95. The evaluator analyzed S.J-D.'s scores on a variety of tests, interviewed S.J-D.'s Lab School teachers, observed her in a classroom setting, and concluded that S.J-D.'s language profile was "not consistent with a student with a disabling oral communication disorder that would prevent her from accessing or gaining benefit from the general education curriculum." AR 290, 1262.

In October 2022, DCPS convened an IEP meeting to discuss those evaluations. AR 304. In attendance were S.J-D.'s father, his attorney, and Amy Mounce, an educational consultant hired by the parents to assist with developing S.J-D.'s IEP. AR 304, 838. DCPS explained its decision not to place S.J-D. under any additional disability classifications. AR 309–10. S.J-D.'s parents objected to DCPS's refusal to add a specific learning disability classification, which would entitle S.J-D. to Speech and Language Services. AR 306. After discussing S.J-D.'s social and emotional struggles, DCPS proposed amending the August 2022 IEP to add behavioral support services (BSS). AR 313. DCPS later added BSS goals to the August 2022 IEP and provided three hours per month of BSS outside general education. AR 344–51.

In May 2023, DCPS held its next annual IEP review with the plaintiffs.  AR 446.  The May 2023 IEP maintained S.J-D.'s disability classification as Other Health Impairment, updated the IEP goals, and provided specialized instruction of (1) five hours per week in written expression and five hours per week in reading, all in general education, and (2) five hours per week in math outside general education.  AR 454–77.  The IEP also included 90 minutes per month of consultation BSS, which provides support to S.J-D.'s teachers, AR 1338, and three hours per month of BSS outside general education, which provides direct support to S.J-D., AR 1342.  AR 476–77.  Finally, the IEP added several new classroom aids and services, including "check-in[s] with trusted adult/social worker when needed," "trusted teacher check-in," and "small groups." AR 476.  DCPS proposed the plaintiffs' local school, Francis Stevens, as the implementing school. AR 452.  Unsatisfied with the proposed IEP, S.J-D.'s parents communicated that they wanted their daughter to remain at the Lab School.  AR 452.

Three days later, on May 19, 2023, S.J-D.'s mother asked to observe the proposed program at Francis Stevens with the family's educational consultant, Amy Mounce.  AR 482.  DCPS offered an observation nearly seven months later.  AR 1093–1094.

## C.    Procedural History

On July 14, 2023, S.J-D.'s parents filed a due process complaint against DCPS in the proper administrative tribunal.  AR 573.  They alleged that S.J-D. had been denied a FAPE due to DCPS's failure to (1) propose an appropriate program or placement for the 2022–23 and 2023–24 school years and (2) timely respond to S.J-D.'s mother's request for an observation of Francis Stevens. AR 40.  The plaintiffs sought (1) reimbursement for S.J-D.'s tuition at the Lab School for the 2022–23 school year and (2) placement at Lab School for the 2023–24 school year.  AR 34.

A four-day due process hearing was held in December 2023 before a hearing officer.  AR 4.
The plaintiffs presented five witnesses: educational consultant Amy Mounce, AR 836–916;
speech-language pathology expert Gretchen Kunz, AR 921–44; the Lab School director of
jurisdictional services Audrey Dolginoff, AR 946–1011; psychologist Susan Hammond, AR
1013–59; and S.J-D.'s father, AR 1062–1132.  DCPS presented six witnesses: psychology expert
Shirley Hodges, AR 1146–212; speech-language pathology expert Delisa Green, AR 1214–83;
school social worker Regina Nadir, AR 1315–59; special education expert Nicole Manuel, AR
1362–437; assistant principal Olamide Gbenro, AR 1439–53; and special education programming
and placement expert Sean Bradley, AR 1286–309.  The hearing officer issued a decision in favor
of DCPS on January 16, 2024.  AR 69.  He found that DCPS had not denied S.J-D. a FAPE in
either year and therefore rejected the parents' claims for reimbursement and placement at the Lab
School.  AR 69.

Following these proceedings, plaintiffs filed this action against the District on March 13,
2024, seeking review of the hearing officer's decision.  *See* Dkt. 3.  The parties filed cross-motions
for summary judgment, which are now ripe for resolution.  *See* Dkts. 9, 11.

## II.    LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one
that could affect the outcome of the lawsuit.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242,
248 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a
reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See*
*Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  "If there are no genuine issues of

material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 F.3d at 895 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In an IDEA suit, "judicial review of an administrative agency's decision by way of summary judgment motion . . . is not a true summary judgment procedure." *Lopez-Young v. District of Columbia*, 211 F. Supp. 3d 42, 50 (D.D.C. 2016) (citation modified). "Instead, the district court essentially conducts a bench trial based on a stipulated record." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (citation modified); *see also Smith v. District of Columbia*, 846 F. Supp. 2d 197, 200 (D.D.C. 2012) (explaining that court review in the IDEA context is like "review of an administrative decision"). When "no additional evidence is introduced in a civil suit seeking review" of a hearing officer's determination, "a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." *Brown v. District of Columbia*, 568 F. Supp. 2d 44, 50 (D.D.C. 2008). "The party challenging the administrative determination takes on the burden of persuading the court that the hearing officer was wrong." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 129 (D.D.C. 2018) (citation modified) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)). The court bases "its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii).

The court must give "due weight" to the hearing officer's determination and "may not substitute its own notions of sound educational policy for those of the school authorities." *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 35–36 (D.D.C. 2013) (citation modified). But "[j]udicial review under [the] IDEA is more rigorous than in typical agency cases." *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 18 (D.D.C. 2008) (citing *Reid ex rel. Reid v. District of Columbia*,

401 F.3d 516, 521 (D.C. Cir. 2005)).  "[A] hearing decision without reasoned and specific findings deserves little deference," *Reid*, 401 F.3d at 521 (citation modified), and in such a case, a "district court may determine that the appropriate relief is a remand to the hearing officer for further proceedings," *id.* at 526 (citation modified).

## III.    ANALYSIS

The plaintiffs contend that S.J-D. was denied a FAPE and ask the Court to reverse the hearing officer's decision and order reimbursement for the 2022–23 and 2023–24 school years at the Lab School.  S.J-D.'s parents argue that the hearing officer erred by (1) disregarding key evidence and relying on flawed evidence when assessing the adequacy of the August 2022 and May 2023 IEPs; (2) improperly assessing the credibility of witnesses; (3) finding that DCPS's failure to offer an observation did not constitute a denial of FAPE; and (4) ignoring DCPS's delay in developing S.J-D.'s August 2022 IEP.  The Court will address each argument in turn.

### A.    Adequacy of the IEPs

Under the IDEA, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.  "Accordingly, for a child fully integrated in the regular classroom, an IEP typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* at 401 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203–04 (1982)); *see Uhlenkamp v. District of Columbia*, 691 F. Supp. 3d 224, 240 (D.D.C. 2023).  An IEP is reviewed as of the time that the IEP "was created rather than with the benefit of hindsight." *Z.B.*, 888 F.3d at 524 (citation modified).

The hearing officer found that the August 2022 and May 2023 IEPs were reasonably calculated to enable S.J-D. to make progress and advance from grade to grade.  He based this

conclusion on S.J-D.'s current performance levels, the IEPs' level of specialized education hours, and the IDEA's least restrictive environment requirement.  AR 27–32.  To prevail on review, the plaintiffs must show by a preponderance of the evidence that "the hearing officer was wrong in concluding that [S.J-D.'s] IEPs were appropriate."  *Edward M.R. v. District of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (citation modified).  The plaintiffs fail to meet that burden.

*First*, the record does not support the plaintiffs' contention that the hearing officer arbitrarily rejected Dr. Hammond's testimony that S.J-D.'s learning profile required full-time specialized instruction that would entirely remove her from a general education environment.  *Contra* Pls.' Mot. at 13–15, Dkt. 9.  As the hearing officer explained, he found Dr. Hammond's recommendations "unpersuasive for several reasons."  AR 30.  In particular, Dr. Hammond failed to evaluate S.J-D. under the proper IDEA criteria for disability classifications, relying instead on the DSM-V criteria, AR 24, 30, 1046; she "did not talk to any of [S.J-D.'s] teachers" at the Lab School or at DCPS, AR 24, 1050–51; she "did not review" records from S.J-D.'s time in a general education environment and was unfamiliar with any quantitative data about the student's performance in that environment, AR 24, 30, 1042; and she did not know what S.J-D.'s class sizes would be at Francis Stevens, AR 30, 1045.

Further, Dr. Hammond's recommendations contradicted the evaluations conducted by DCPS witnesses Hodges and Green, whom the hearing officer found to be "more balanced and credible."  AR 30.  Hodges explained that Dr. Hammond's evaluation overemphasized a single subtest result to reach her diagnosis.  AR 1167, 30.  Green, for her part, applied the IDEA criteria and concluded that S.J-D. lacked a disabling communication disability that would "prevent her from accessing or gaining benefit from the general educational curriculum."  AR 292, 19; *see* AR 1261–63 ("[G]iven her linguistic profile, I don't see anything that would preclude her from being

able to benefit from [a general education environment] . . . . There was nothing that indicated that [S.J-D.] had a disabling oral communication disorder that would require speech and language therapy."). Faced with such conflicting testimony, the Court gives "'due weight' to the hearing officer's credibility determinations." *J.T. v. District of Columbia (J.T. I)*, No. 20-cv-7105, 2022 WL 126707, at *2 (D.C. Cir. Jan. 11, 2022) (quoting *Rowley*, 458 U.S. at 206); *see J.T. v. District of Columbia (J.T. II)*, 496 F. Supp. 3d 190, 207 (D.D.C. 2020) ("[T]he hearing officer is best positioned to make credibility judgments as to testifying witnesses and resolve factual disputes that amount to inconsistent testimony.").

*Second*, the hearing officer did not ignore Mounce's determination that "a general education setting was not appropriate for S.J-D." Pls.' Mot. at 16. Instead, he found that Mounce's conclusion, which was based on limited information, was "pure conjecture" and "speculative" as to how S.J-D. would perform in a general education environment. AR 32. Mounce's testimony was based on "current year data from the Lab School evaluations, information provided by the family and [the] Lab School, [her own] observations, and [a] review of all the documents." AR 870. She pointed to S.J-D.'s "academic levels, but also her anxiety, her academic levels, coupled with her memory weakness and language weakness, functioning in a larger class." AR 872. And Mounce recounted, "[E]ven in the classes I saw [at the Lab School] where it was four, seven students, excuse me," S.J-D. "still required [an] adult . . . checking in" and needed "the reassurance and the prompting and having her rehearse what is the next step." *Id.* According to Mounce, "that just can't be programmed for in a larger setting." *Id.* [1]

---

[1] In addition, the plaintiffs note that they alerted DCPS in May 2023 to their observation that S.J-D. "is really struggling, even in a class size of 4 with really good teachers" at the Lab School. AR 446; Pls.' Opp'n & Reply at 7, Dkt. 14. Because S.J-D. struggled even in a small-group setting, the plaintiffs argue that DCPS was wrong to ignore their request for full-time specialized instruction and to keep her primarily in a general education environment. But the plaintiffs fail to

But the mere fact that S.J-D. required "an adult . . . checking in" with her in a special education environment does not mean that such check-ins would be ineffective in a general education environment. *See H.R. v. District of Columbia*, No. 21-cv-1856, 2024 WL 3580663, at *7 (D.D.C. July 30, 2024) (finding that testimony "based on the unsupported assumption that because [a student] had progressed in smaller class sizes, he could not progress in larger ones" was "based on conjecture" and insufficient). Mounce provided no basis to conclude that DCPS could not effectively provide the kind of supports that allowed S.J-D. to succeed at the Lab School. In fact, S.J-D.'s IEPs specifically provided for direct adult supervision through frequent check-ins, checks for understanding, and repetitions of directions by her teachers. AR 224, 476. Given credible testimony that "S.J-D. would benefit from interaction with non-disabled peers," AR 25, 1262, the hearing officer properly determined that Mounce's testimony failed to establish that S.J-D. required full-time specialized instruction in light of IDEA's least restrictive environment requirement.

*Third*, even assuming that it was improper for the hearing officer to rely on S.J-D's progress reports from the COVID-19 years, as the plaintiffs argue,[2] Pls.' Opp'n & Reply at 4, the record,

---

specify that this observation was from S.J-D.'s math class. AR 446, 450. And S.J-D.'s IEPs specifically provided for specialized instruction outside general education in math. AR 476. Indeed, DCPS targeted math as S.J-D.'s "greatest weakness" and increased the hours of specialized instruction where she would have "no more than 12 students in the classroom" with "one certified teacher and one teacher's aide." AR 1400. Ultimately, the May 2023 IEP proposed five hours of math *outside* general education, an increase from two hours in the August 2022 IEP. Considered together, the Court finds that these adjustments were reasonably calculated to allow S.J-D. to progress in the least restrictive environment.

[2] The Court agrees with the plaintiffs that the record is, at a minimum, unclear as to the type of learning environment S.J-D. experienced at Francis Stevens from 2020 to 2021, when S.J-D was receiving virtual instruction, rather than in-person instruction. On the one hand, a section of S.J-D.'s February 2021 IEP states that she "had been working predominantly in groups one on one with a teacher or with one other student." AR 137. On the other hand, her progress reports under the same IEP suggest that S.J-D.'s virtual education was representative of a general education

taken as a whole, substantiates the hearing officer's conclusion that the 2022 and 2023 IEPs were supported by a "requisite analysis of [S.J-D.'s] circumstances" and "reasonably calculated to afford her an opportunity to make progress in light of her particular circumstances," *Z.B.*, 888 F.3d at 518.

Starting with the August 2022 IEP, both Dr. Hammond's and DCPS's assessments reflected that in 2022, "S.J-D.'s [r]eading scores ranged from [a]verage to high [a]verage, her [w]riting scores were all in the [a]verage range," and her math scores "were in the [a]verage range for *all* areas except Math Problem Solving." AR 65. S.J-D.'s academic performance therefore showed that she was "capable of average range achievement scores and above average grades," and her "academic deficits" did "not support a full-time special education placement." *A.D. ex rel. E.D. v. District of Columbia*, 20-cv-2765, 2022 WL 683570, at *9 (D.D.C. Mar. 8, 2022). Thus, where "the data pointed to average functioning," DCPS appropriately sought to "keep [S.J-D] in the general education setting and offer her supports in that placement." AR 1387. To support S.J-D. in those areas, DCPS prescribed specialized instruction in general education of one hour per week in written expression and two hours per week in reading. AR 224. And in math, where S.J-D. was underperforming on at least one metric, DCPS appropriately prescribed specialized instruction of two hours per week *outside* general education in addition to one hour per week in general education. AR 1387.

---

environment. For example, S.J-D. mastered a goal "introduced in the general education curriculum," AR 119, worked on goals "in the context of the general education curriculum," AR 120, 126, and solved problems "embedded in the current general education curriculum that the class [was] working on," AR 123. Because the record does not make clear that S.J-D. was in a general education environment at the time, the Court will assume for purposes of its ruling that the hearing officer's reliance on progress reports from the COVID-19 years was erroneous.

In S.J-D.'s May 2023 assessments, her math scores dropped to the eighth percentile, and her reading scores were just below average at the twentieth percentile.  AR 456, 460.  Accordingly, DCPS placed the entirety of S.J-D.'s specialized instruction in math *outside* general education and increased those services to five hours per week.  AR 476.  And for both reading and writing, DCPS likewise increased her specialized instruction in general education to five hours per week.  AR 476.  DCPS did so "out of an overabundance of caution . . . to make sure that [they] were giving [S.J-D.] as much support as possible as she made that transition [to seventh grade]."  AR 1400.  In other words, where S.J-D. struggled, DCPS responded with additional specialized instruction.

In sum, both of the contested IEPs appropriately balanced S.J-D.'s underachievement in math against the IDEA's requirement that S.J-D. remain in the least restrictive environment possible.  The August 2022 IEP noted that S.J-D. "demonstrated difficulties in math that require small group math support."  AR 225.  Likewise, the May 2023 IEP stated that S.J-D. "will benefit from specialized instruction in math outside the general education setting to meet her academic needs."  AR 477.  Besides those carve-outs for math, DCPS witnesses explained that the data supported their finding that S.J-D. would progress in a general education environment, AR 1261–1262, 1334, 1343, 1405–06, and that the IEPs otherwise addressed S.J-D.'s challenges in executive functioning and attention through "supports and accommodations [under which she] is able to make progress" instead of "over[-]pathologizing [and] saying that a child has significant and severe deficits," AR 1182, 25.

Indeed, each reason articulated by the plaintiffs' witnesses in favor of full-time specialized instruction was accounted for by the accommodations that DCPS provided in the IEPs.  *See H.R.*, 2024 WL 3580663, at *7 ("[M]uch of the witnesses' rationales for full-time special education were already addressed in the IEPs." (citation modified)).  Dr. Hammond was "concerned about [S.J-D.]

falling between the cracks, that she wouldn't understand what was happening . . . [a]nd [that] with too many kids in the classroom, the teachers might not notice that she was completely at sea." AR 1035. Mounce testified that "[S.J-D.] still required that adult . . . checking in, [and] the reassurance and the prompting and having her rehearse what is the next step . . . that just can't be programmed for in a larger setting." AR 872. Kunz likewise opined that S.J-D. needed to be in a small classroom, because "[S.J-D.] needed teacher check-ins, . . . less distractions, less people around, less noise," and "supports of repetition [and] clarification." AR 938. Dolginoff reasoned that a general education environment would be inappropriate because S.J-D. would not "ask[] for help independently, or even clarification." AR 981–82. And S.J-D.'s father testified that a "large classroom . . . just doesn't work with her anxiety and executive functioning, especially her task initiation." AR 1114.

In response to these concerns, DCPS programmed for "frequent check[-]ins & checks for understanding," "repetition of directions," and "access to noise-cancelling headphones [and] privacy boards" in the general education environment. AR 224, 476. The May 2023 IEP further provided for "small groups," "trusted teacher check-in[s]," and behavioral support services outside general education. AR 476. On this record, the plaintiffs "have not shown that the [IEPs] lacked appropriate types or hours of instruction." *Z.B.*, 888 F.3d at 527. Rather, the Court finds that the IEPs were tailored to provide S.J-D. with services directly responding to her particular needs.

At bottom, the plaintiffs argue that the IEPs "did not provide [S.J-D.] enough small-group or individual education, especially by contrast to the full-time special education offered at the Lab School." *Id.* at 528; *see* Pls.' Mot. at 13. But "[w]ithout more, that argument runs up against the IDEA's imperative that, to the maximum extent appropriate, public schools provide students with disabilities an education in the least restrictive environment possible." *Z.B.*, 888 F.3d at 528.

(citation modified).  It is undisputed that S.J-D. advanced from grade to grade in the pre-pandemic general education environment.  *See* Def.'s Opp'n & Mot. at 24, Dkt. 11; *see generally* Pls.' Opp'n & Reply.  And the overall record indicates that S.J-D. can satisfactorily progress in the regular classroom with "the use of supplementary aids and services."  *See* 20 U.S.C. § 1412(a)(5)(A).  In accordance with the IDEA, DCPS appropriately calibrated S.J-D.'s IEPs to provide (1) support services that would allow her to "receive education in the regular classroom whenever possible" and (2) specialized instruction outside general education when it was justifiably required.  *Endrew F.*, 580 U.S. at 400 (citation modified).  The plaintiffs therefore fail to show that the hearing officer erred in concluding that the IEPs were adequate.

### B.    Hearing Officer's Credibility Determinations

Next, the plaintiffs make several arguments that the hearing officer made erroneous credibility determinations, but none of them prevails.

Courts must give "due weight to the administrative proceedings and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education." *Long v. District of Columbia*, 780 F. Supp. 2d 49, 59 (D.D.C. 2011) (citation modified).  The Court need not "defer to a [hearing officer's] decision that lacks reasoned and specific findings," *McNeil v. District of Columbia*, 217 F. Supp. 3d 107, 114 (D.D.C. 2016), and it expects school authorities to "offer a cogent and responsive explanation . . . that shows the IEP is reasonably calculated," *Endrew F.*, 580 U.S. at 404.  "[T]he hearing officer," however, "is best positioned to make credibility judgments as to testifying witnesses and resolve factual disputes that amount to inconsistent testimony." *J.T. II*, 496 F. Supp. 3d at 207.  Therefore, "[a] hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record."  *McAllister v. District of Columbia*, 45 F. Supp. 3d 72,

76 (D.D.C. 2014) (citation modified).  And when a "dispute boils down to conflicting testimony," the court "must give 'due weight' to the hearing officer's credibility determinations." *J.T. I*, 2022 WL 126707, at 2* (quoting *Rowley*, 458 U.S. at 206).

*First*, the plaintiffs complain that the hearing officer credited Hodges and Green over Dr. Hammond.  With respect to Hodges, they contend that her report "had no information about S.J-D.'s performance at [Francis Stevens] or in the general education setting" and that Hodges failed to "complete [an] assessment of S.J-D . . . administered *by another school psychologist*." Pls.' Mot. at 29.  The plaintiffs further argue that Hodges's testimony was not "cogent and responsive." *Id.* at 26.

But this argument "ignores the subject matter on which the witness[] [was] testifying." *B.B. v. District of Columbia*, 20-cv-2467, 2022 WL 834146, at *12 (D.D.C. Mar. 21, 2022). Hodges was credited as an expert in school psychology.  AR 1146.  She testified about her review of S.J-D.'s records, AR 1158–59; her participation in the Analysis of Existing Data meeting, AR 1151; her attendance at the October 2022 IEP meeting, AR 1178; and her evaluation of S.J-D.'s cognitive performance under the IDEA criteria, AR 1169–70.  Hodges also analyzed S.J-D.'s scores in Dr. Hammond's evaluation and in DCPS's own assessment.  Based on that data, Hodges concluded that S.J-D.'s cognitive performance was more consistent with an Other Health Impairment from ADHD and that it did not present evidence of a disabling condition consistent with the additional specific learning classification advocated by Dr. Hammond.  AR 309–10.

The Court defers to the hearing officer's resolution of this conflict between Dr. Hammond's and Hodges's testimonies.  *See J.T. I*, 2022 WL 126707, at *2.  He chose to credit Hodges's analysis, which used the proper IDEA criteria and concluded that S.J-D. was not "performing significantly below age and grade expectation as it relates to her cognitive

performance" such that she required a specific learning disability classification. AR 1175. Hodges explained that S.J-D.'s low phonological proficiency test score—on which Dr. Hammond based her clinical diagnosis—was an outlier compared to S.J-D.'s other scores. AR 1167. She also testified that DCPS sought "not to over pathologize" and to "look[] at the data and what the data says and mak[e] sure that [DCPS is] following those determinations." AR 1182. Hodges acknowledged that S.J-D.'s challenges with ADHD and executive functioning—as identified in Dr. Hammond's report—showed "vulnerabilities or areas of support." *Id.* But she explained that those challenges did not create "a disabling condition" such that S.J-D. had "significant and severe deficits" requiring full-time special education. AR 1181–82. With such reasoning, Hodges's testimony was cogent and responsive. *See Endrew F.*, 580 U.S. at 404.

As for Green's testimony, the plaintiffs argue that the hearing officer "fail[ed] to provide any *legal* analysis as to why [her] testimony and opinion were given more weight." Pls.' Mot. at 30 (emphasis added). "It is undisputed that a hearing officer is entitled to make reasonable credibility determinations and, in the absence of extrinsic evidence to the contrary, those determinations are entitled to deference from the [c]ourt." *Wimbish v. District of Columbia*, 381 F. Supp. 3d 22, 29 n.5 (D.D.C. 2019) (citation modified). Here, the hearing officer found that Green's evaluation was more credible than Dr. Hammond's and that it "refuted [Dr. Hammond's] assertion that [S.J-D.] has a disabling communication disability." AR 30–31. That determination was reasonable and deserves deference. Green was qualified as an expert in speech and language pathology. AR 1214. She explained that "the field of psychology is very different from the field of speech pathology." AR 1225. Upon reviewing Dr. Hammond's report, Green determined that "there were no super red flags for . . . a speech and language disorder" but still agreed to do a speech and language evaluation out of an "overabundance of caution." AR 1223. To evaluate

S.J-D.'s speech and language capabilities, Green met with S.J-D.'s teachers at the Lab School, observed S.J-D. in the classroom, and conducted multiple speech and language tests. AR 1262. Besides S.J-D.'s receptive vocabulary score, which was less than "one standard deviation below the mean" and therefore borderline "below the average range," AR 1238, S.J-D.'s language performance was "commensurate with her age-matched peers," AR 1241, and her "profile [was] not consistent with a student with a disabling communication disorder," AR 1249. Green further explained that the discrepancy between S.J-D.'s expressive and receptive vocabulary scores was attributable to her attention deficits. AR 1237–38. She opined that S.J-D. would "benefit from interaction with her typically developing or nondisabled peers in a general education environment" because that exposure would "sharpen [her] linguistic skills" and "[nothing] would preclude her form being able to benefit from that." AR 1261–62. Like Hodges's testimony, Green's testimony therefore provided a "cogent and responsive explanation." *Endrew F.*, 580 U.S. at 404.

*Second*, the plaintiffs argue that the hearing officer improperly discredited Mounce's testimony that S.J-D required full-time specialized instruction. They contend that instead of accepting Mounce's conclusion, the hearing officer erroneously relied on S.J-D.'s previous progress reports. Pls.' Mot. at 30. But, as the Court already found above, *see supra* at 12–13, any misplaced reliance on the progress reports does not taint the hearing officer's conclusion that Mounce's testimony was based on "pure conjecture," AR 32. Nor does it call into question the hearing officer's determination that Mounce's recommendation to place S.J-D. in a full-time specialized environment conflicted with the IDEA's least restrictive environment mandate. *See Z.B.*, 888 F.3d at 528. And, again, Mounce's concerns about S.J-D.'s ability to progress in a general education environment were accounted for by the numerous support services included in her IEPs. *See supra* at 15–16.

*Third*, the plaintiffs argue that the hearing officer improperly ignored the testimonies of Kunz and Dolginoff because he "did not consider their opinion at all in reaching his conclusions [of law]." *See* Pls.' Mot. at 16–17. Citing *M.O. v. District of Columbia*, the plaintiffs argue that the hearing officer's omission amounted to a fatal lack of "sufficiently detailed reasoning." 20 F. Supp. 3d 31, 40 (D.D.C. 2013).

The facts of this case are different. In *M.O.*, the court found that the hearing officer's decision lacked any "discussion of the adequacy of the District's consideration of the recommendations, or why the District's review of the evaluations was credited over those of the plaintiffs' witnesses." *Id.* at 41. But here, the hearing officer thoroughly recounted the testimony of each witness, including Kunz and Dolginoff, in his findings of fact. AR 23. Kunz opined that S.J-D. required speech and language services. *Id.* Both argued that S.J-D. required full-time specialized education. *Id.* Their testimonies directly contradicted the testimonies of Green and Hodges, both of whom the hearing officer found to be "balanced and credible." AR 30. And Kunz's and Dolginoff's asserted reasons for full-time specialized education were addressed by the support services included in S.J-D.'s IEPs. *See supra* at 15–16. The Court therefore defers to the hearing officer's weighing of the conflicting testimonies. *See K.S. v. District of Columbia*, 962 F. Supp. 2d 216, 225 (D.D.C. 2013) ("[W]hile Plaintiffs contend that the hearing officer's failure to explain why he was discounting the testimony of their experts merits remand, the Court cannot concur. Because he otherwise provided substantial justification for his determination that [the student] was receiving sufficient educational benefit . . . no remand for further elaboration is warranted.").

*Fourth*, the plaintiffs argue that the hearing officer improperly credited DCPS witnesses Manuel and Hodges even though they had never met, observed, or evaluated S.J-D. Pls.' Mot. at

30–31.  But as the plaintiffs admit, both were "qualified in their respective fields."  *Id.* at 30.

Manuel and Hodges were members of the DCPS Central IEP team and participated in various IEP

meetings and reviews of S.J-D.'s records to develop her IEPs.  AR 35–36, 211, 228, 308, 365, 450.

As a school psychologist, Hodges reviewed Dr. Hammond's report and analyzed S.J-D.'s

disabilities under the IDEA criteria.  AR 1169–70.  As a program specialist and licensed teacher

for general and special education, Manuel drafted the May 2023 IEP.  AR 1362, 1386–88, 1396.

In accordance with their respective roles, Hodges and Manuel appropriately testified about their

own analyses and how they developed S.J-D.'s IEPs based on the relevant data—including data

collected from in-person observations conducted by other DCPS witnesses.  *See* AR 1231–32

(Green's observation and assessments), 1322 (Nadir's first observation), 1336 (Nadir's second

observation).  Ultimately, the hearing officer weighed the opinions before him and found Hodges

and Manuel to be more credible.  AR 30.  The plaintiffs offer no concrete reason to disturb that

finding.  *See B.B.*, 2022 WL 834146, at *10 ("Hearing Officers have the opportunity to hear

testimony in person, examine the demeanor of the witness and reactions of the participants, and

bring immeasurable experience and expertise in this specialized area." (citation modified)).

        In sum, contrary to the plaintiffs' arguments, "there is no evidence that blind deference was

accorded to the [DCPS] witnesses by the [h]earing [o]fficer."  *Id.* at *12.  *Contra* Pls.' Mot. at 30.

Because the hearing officer's decision does not lack "reasoned and specific findings" as to the

witnesses before him, *McNeil*, 217 F. Supp. 3d at 114 (citation modified), and the plaintiffs have

not shown extrinsic evidence to the contrary, the Court will defer to the hearing officer's credibility

determinations, *Wimbish*, 381 F. Supp. 3d at 29 n.5 (citation modified).

### C.    Procedural Violations

A procedural violation creates a viable claim under the IDEA "only if [that] procedural violation[] affected the student's *substantive* rights." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (citation modified).  To establish a denial of substantive rights such that a "child did not receive a [FAPE]," the plaintiffs must show that the procedural inadequacies (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process for the provision of a FAPE to the parents' child; or (3) caused a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).

#### 1.    DCPS's Failure to Offer an Observation

The plaintiffs are correct that DCPS's failure to provide a timely observation of the proposed program at Francis Stevens constituted a procedural violation. Pls.' Mot. at 32.  DCPS's failure denied the plaintiffs an opportunity to observe how Francis Stevens would implement the proposed IEP.  *See* D.C. Code § 38-2571.03(5)(A).  And a violation of "the-right-to-observe provision" may indeed "impede[] [a parent's] opportunity to participate in the decisionmaking process regarding the provision of a FAPE." *Middleton*, 312 F. Supp. 3d at 147–48.

The plaintiffs have not, however, shown "a serious deprivation, in light of the many opportunities [the] plaintiff[s] had for participation." *J.T. II*, 496 F. Supp. 3d at 203.  S.J-D.'s parents had "substantial input" at all stages of the IEP development. *Cooper v. District of Columbia*, 77 F. Supp. 3d 32, 38 (D.D.C. 2014).  S.J-D.'s father attended the August 2022 and October 2022 meetings, where he communicated his feedback on the proposed IEP.  AR 1077, 1080.  Both parents and their educational consultant attended and shared their feedback during the January 2023 meeting and the May 2023 IEP review.  AR 354–56, 446–49.  "At each meeting, [the] plaintiff[s] had substantial input into the IEP baselines, annual goals, special education and

related services requirements that the [IEP team] developed on behalf of [S.J-D.]." *Cooper*, 77 F. Supp. 3d at 38. And where appropriate, the IEP team responded to the plaintiffs' concerns by adjusting S.J-D.'s specialized instruction and classroom supports. *See, e.g.*, AR 355, 448. Such parental involvement in IEP development indicates meaningful participation such that there was no denial of a FAPE. *Paolella ex rel. Paolella v. District of Columbia*, 210 Fed. Appx. 1, 3 (D.C. Cir. 2006).

### 2.    DCPS's Delay

The plaintiffs also argue that DCPS's delay in developing S.J-D.'s August 2022 IEP constituted a substantive denial of a FAPE. Pls.' Mot. at 23–26.

DCPS's delay in convening the team meeting amounts to a "failure to meet a procedural deadline," and the parents must therefore show that the delay affected S.J-D.'s substantive rights. *D.R. ex rel. Robinson v. Gov't of D.C.*, 637 F. Supp. 2d 11, 18 (D.D.C. 2009) (citation modified) (quoting *Lesesne*, 447 F.3d at 834). But because the plaintiffs failed to raise this procedural violation before the hearing officer, AR 6–7, 616, they cannot seek judicial review of it here, *see Douglass v. District of Columbia*, 605 F. Supp. 2d 156, 165 (D.D.C. 2009) (citing *Honig v. Doe*, 484 U.S. 305, 326–27 (1988)) ("Judicial review is generally unavailable under the IDEA unless all administrative procedures have been exhausted.").

### D.    Reimbursement

Because the Court concludes that the District did not deny S.J-D. a FAPE for the 2022–23 and 2023–24 school years, it will not consider the plaintiffs' request for tuition reimbursement.

**CONCLUSION**

For the foregoing reasons, the Court denies the plaintiffs' motion for summary judgment, Dkt. 9, and grants the District's cross-motion for summary judgment, Dkt. 11. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 22, 2025